United States Bankruptcy Court
District of Massachusetts

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 06-42638-HJB |
| KEITH E. HAYES, | ) |  |
| MONICA B. HAYES, | ) |  |
|  | ) |  |
| Debtors | ) |  |

**AMENDED MEMORANDUM OF DECISION**

Before the Court is the United States Trustee's (the "Trustee") "Motion to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(2) and to Extend Time to Object to Discharge Pursuant to 11 U.S.C. § 727 and Move to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(3)" (the "Motion to Dismiss"), and the debtors' objection thereto. Specifically, the Court must address an issue that has arisen in many jurisdictions since the passage of the Bankruptcy Abuse and Protection Act of 2005[1] (the "BAPCPA") – whether, for purposes of the "means test," a debtor may deduct payments to secured creditors when the debtor has indicated an intention to surrender the secured property.

I.    FACTS AND TRAVEL OF THE CASE

The material facts relevant to the limited question before the Court are not in

---

[1] See S. 256, Pub. L. 109-8, 11 Stat. 23 (2005). Since the present case was filed in 2006, following the October 17, 2005 effective date of the BAPCPA, the amended statute applies.

dispute. Keith and Monica Hayes (the "Debtors") filed a petition under Chapter 13 of the Bankruptcy Code[2] on November 29, 2006. On their bankruptcy schedules filed in conjunction with the case,[3] the Debtors disclosed, *inter alia*, debts of $102,951.28 and $411,416.00, respectively, secured by a mortgages on the Debtors' residence.

On March 5, 2007, the case was converted to Chapter 7, following which the Debtors filed a "Chapter 7 Statement of Current Monthly Income and Means-Test Calculation" ("Form 22A", formerly "Form B22A") on March 20, 2007. On Form 22A, the Debtors calculated their Current Monthly Income ("CMI") as $7,917.32 and monthly expenses as $9,467.18. Included in their monthly expense calculation were the payments due to each of the two mortgagees. On March 25, 2007, the Debtors filed their "Chapter 7 Individual Debtor's Statement of Intention" (the "Statement of Intention") regarding their secured debts, wherein they indicated, *inter alia*, that they intended to surrender their residence secured by the two mortgages. See 11 U.S.C. § 521(a)(2)(A); Official Form 8.[4]

The meeting of creditors pursuant to § 341 was held on April 3, 2007. On April 13, the Trustee filed the notice required by § 707(b)(4), reflecting her determination that the Debtors' case under Chapter 7 was presumptively abusive pursuant to § 707(b). And on May 15, 2007, the Trustee filed the instant Motion to Dismiss.

---

[2] See 11 U.S.C. §§ 101, et seq (the "Bankruptcy Code" or the "Code"). Unless otherwise noted, references to specific statutory provisions will hereinafter refer to provisions of the Bankruptcy Code.

[3] See 11 U.S.C. § 521(a)(1).

[4] Subsequent to the conversion of the case, each of the mortgagees sought and received relief from the automatic stay in order to foreclose on the property. There is no information on the record as to whether a foreclosure sale has taken place.

At the hearing on the Motion to Dismiss and the Debtors' objection thereto, the Court continued generally the Trustee's request for an extension of time to object to discharge or move for dismissal under § 707(b)(3) and took under advisement the "limited question of whether an above-median debtor in a Chapter 7 case may, for purposes of the means test, deduct mortgage payments on property which the debtor intends to surrender."

II.  POSITIONS OF THE PARTIES

    A.  **Statutory Framework**

A discussion of the parties' positions must first begin with a brief description of the statutory framework within which the present dispute arises. Pursuant to § 707(b)(2) of the Bankruptcy Code, as amended by the BAPCPA, a Chapter 7 bankruptcy case filed by an individual whose debts are primarily consumer debts[5] is subject to dismissal if the Court finds that "the granting of relief would be an abuse. . . ." 11 U.S.C. § 707(b)(1). "Abuse," in turn, may be determined pursuant to either § 707(b)(2) or § 707(b)(3). The present case, however, concerns only § 707(b)(2), which sets forth a detailed mathematical "formula" for determining whether a "presumption of abuse" has arisen in a particular Chapter 7 case – the so-called "means test."

As explained by the Bankruptcy Court in In re Singletary, § 707(b)(2) "creates a presumption of abuse under certain circumstances when a debtor's disposable income exceeds fixed amounts. Pursuant to Fed. R. Bankr. P. 1007(b)(4), and in order to facilitate the execution of the means test calculations, Official Form [22A] is completed by every

---

[5] The parties do not dispute that the Debtors' are individuals with primarily consumer debts. See 11 U.S.C. § 101(8).

debtor and filed along with his schedules." 354 B.R. 455, 460-461 (Bankr. S.D. Texas 2006). The first portion of Form 22A is used to calculate the debtor's current monthly income, or "CMI". 11 U.S.C. § 707(b)(2)(A)(i).[6] If the debtor's CMI is below the state median income for a household of the same size, the § 707(b)(2) inquiry ends and no presumption of abuse arises. 11 U.S.C. § 707(b)(7).

If, however, the debtor's CMI is greater than the applicable median income, the debtor must complete the expense deduction calculations provided by §§ 707(2)(A)(ii)-(iv). As the Trustee succinctly explained in her brief filed in support of the Motion to Dismiss, a presumption of abuse

> does not arise if an above-median debtor's monthly disposable income is less than $100 per month (or $6,000 over 60 months). 11 U.S.C. § 707(b)(2)(A)(i). If the debtor's monthly disposable income exceeds $166.67 per month (or $10,000 over 60 months), the presumption of abuse arises.

---

[6] "Current Monthly Income" is a defined term and refers to:

(A) . . . the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on –

    (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

    (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes [certain enumerated payments].

11 U.S.C. § 101(10A).

4

<u>Id.</u>  If the debtor's monthly disposable income is between $100 and $166.67 per month, the presumption of abuse arises if that amount, over 60 months, if sufficient to pay at least 25% of the debtor's nonpriority secured debt.  <u>Id.</u>[7]

If the "means test" calculation of § 707(b)(2) demonstrates that a case is presumed abusive, the Trustee must either file a motion to dismiss the debtor's case or a statement of reasons why she declines to do so.  11 U.S.C. § 704(b)(2).  If a motion to dismiss is filed, the debtor may, by "demonstrating special circumstances," rebut the presumption.  11 U.S.C. § 707(b)(2)(B)(i).  Should the Court determine that the Trustee is correct in her assertion that the presumption of abuse has arisen and finds that the Debtor has not successfully rebutted that presumption, then the debtor has the option of voluntarily converting the case to one under Chapter 13.  11 U.S.C. § 707(b)(1).  If the debtor does not so choose, the case will be dismissed.  <u>Id.</u>

Here, the Debtors' CMI, $7,917.32, yields an annualized income of $95,007.84, which is $3,287.84 more than the $91,720.00 median income in Massachusetts for a household of the same size (a household of five).  The Debtors, therefore, were required to calculate and deduct their expenses pursuant to §§ 707(b)(2)(A)(ii)-(iv).  The Debtors completed the required calculations on Form 22A, including in their calculation $4,545.77

---

[7] Specifically, § 707(b)(2)(A)(i) states:

In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of –

(I)   25 percent of the debtor's non-priority unsecured claims in the case, or $6,000, whichever is greater; or

(II)   $10,000.

5

in monthly mortgage payments. They further indicated on the form that no presumption of abuse had arisen, as their total allowed expenses were $9,467.18 (approximately $1,500.00 *more* than their CMI).

The Trustee, however, takes issue with the Debtors' deduction of mortgage payments as allowable expenses pursuant to § 707(b)(2)(A)(iii)(I), which allows debtors to deduct from their CMI the average of monthly payments due on secured debt, "calculated as the sum of . . . the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition . . . ." 11 U.S.C. § 707(b)(2)(A)(iii)(I). The Trustee contends that the mortgage expenses should *not* be included in the Debtors' mean-test calculation because the Debtors, on the Statement of Intention, have indicated an intent to surrender their residence. Instead, the Debtors should be allowed only to claim the $1,711 standard mortgage/rent expense provided by the Local Standards for housing and utilities issued by the Internal Revenue Service. According to the Trustee's calculation, the Debtors have a monthly disposable income of $1,156.47,[8] well above the $166.67 threshold for presumed abuse.

**B.     Trustee's Position**

The Trustee argues that the phrase "scheduled as contractually due to secured creditors in each of the 60 months following the date of the petition" requires the Court to examine a debtor's bankruptcy schedules and statements, including the Statement of Intention, and to ascertain whether the claimed expense for secured debt "*will actually be*

---

[8] The Trustee's calculation also differs from the Debtors' in that the Trustee added a monthly expense of $128.50 for the projected average monthly Chapter 13 administrative expense.

6

*paid* by the debtor in the future." According to the Trustee, both a plain reading of the statute and a consideration of congressional intent compel this approach.

First, as to the statutory language, the Trustee argues that the term "scheduled" refers to a debtor's bankruptcy schedules and statements filed with the case. Thus, the Court must consider a debtor's intention to surrender property, as stated in their Statement of Intention, to determine whether a claimed secured payment will be "contractually due" in the future. Additionally, the Trustee posits that the ordinary meaning of the word "following" leads to the conclusion that deductions for secured payments are only allowed if they "will be made 'subsequent to' or 'after' the petition date, and payments for surrendered property that will never be made would not qualify."

To support her argument, the Trustee relies on legislative history – specifically, Congress' stated purpose that the BAPCPA was intended to ensure "that those who can afford to repay some portion of the unsecured debts be required to do so . . . ." 151 Cong. Rec. S2470 (March 10, 2005). The Trustee maintains that allowing a deduction for secured property the debtor intends to surrender amounts to allowing a deduction for a "phantom" expense in contravention of Congress' intent that debtors use their disposable income to pay unsecured debts insofar as they are able.

### C. The Debtors' Position

The Debtors, not surprisingly, read the statute differently. According to the Debtors, the phrase "scheduled as contractually due" should be afforded the meaning given to it by the Bankruptcy Court in In re Walker, namely, that the phrase simply refers to those payments due and owing pursuant to the relevant contract at the time the petition is filed. 2006 WL 1314125, *3, 2006 Bankr. LEXIS 845, *9 (Bankr. N.D. Ga. 2006). The word

"scheduled," in this sense, takes into account the fact that payments may not *actually* be made. The Debtors contend that if Congress' intention was to restrict the expense to only those payments that would actually be made, it would have restricted the deduction accordingly.

Furthermore, the Debtors argue, Congress' plan in passing the means test was to create a mechanical, mathematical formula for determining whether or not a presumption of abuse arises in a particular case. A case-by-case approach to determining whether a payment on a secured debt will *actually* be made in the future injects the kind of uncertainty and judicial discretion that Congress distinctly sought to avoid by the creation of the "means test." According to the Debtors, a consideration of facts and circumstances beyond the simple calculations required by Form 22A is reserved for determinations of abuse pursuant to § 707(b)(3) and is not relevant in determining whether a presumption of abuse has arisen under § 707(b)(2). Therefore, the Debtors say, they are entitled to deduct the mortgage expenses on Form 22A and thus no presumption of abuse has arisen in their case.

III.    DISCUSSION

A proper interpretation of § 707(b)(2)(A)(iii)(I) "begins where all such inquiries must begin: with the language of the statute itself." United States v. Ron Pair Enter., Inc., 489 U.S. 235, 241 (1989) (citing Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985)). "[W]hen the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." Lamie v. United States, 540 U.S. 526, 534 (2004) (quoting Hartford Underwriters Ins. Co.

v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000); Ron Pair, 489 U.S. at 241; Caminetti v. United States, 242 U.S. 470, 485 (1917)).

### A. "Scheduled as contractually due"

We begin by parsing the phrase "scheduled as contractually due."

> The common meaning of "as contractually due" is that the debtor is legally obligated under the contract, in this case, a promissory note, to make a payment in a certain amount, with a certain amount of interest, for a set number of months into the future.

In re Walker, 2006 WL 1314123 at *3, 2006 Bankr. LEXIS 845 at *9 (Bankr. N.D. Ga. 2006). There is no dispute as to the nature of the Debtors' obligations under the contracts between the Debtors and the holders of the mortgages. At the time the petition was filed, the Debtors were contractually obliged to make monthly mortgage payments in fixed amounts.

The more interesting question, however, is what to make of the phrase ["scheduled as contractually due"] as a *whole*, i.e. what meaning to give to the phrase "scheduled as" in reference to those payments which are "contractually due." Recent case law appears to split into two main interpretive camps. A compelling analysis is provided by those courts which have concluded that "[a]lthough "scheduled" is not a statutorily-defined term, it is repeatedly given a specific meaning under the Code rather than the general meaning . . . . Therefore, . . . the word 'scheduled' in § 707(b)(2)(A)(iii)(I) . . . refer[s] to a debt being listed on the Debtors' official schedules . . . ." In re Singletary, 354 B.R. 455, 467 (Bankr. S.D. Tex. 2006); see also In re Haar, 360 B.R. 759, 765 (Bankr. N.D. Ohio 2007); In re Ray, 362 B.R. 680, 685 (Bankr. D.S.C. 2007); In re Harris, 353 B.R. 304, 309 (Bankr. E.D. Okla. 2006); In re Skaggs, 349 B.R. 594, 599 (Bankr. D. Mo. 2006).

9

The other view, endorsed with excellent analyses by the courts in, *inter alia*, In re Walker, 2006 WL 1314123, 2006 Bankr. LEXIS 845, and In re Nockerts, 357 B.R. 497 (Bankr. E.D. Wisc. 2006), adopts the common, dictionary-defined meaning of "scheduled" as "planned for a certain date." Walker, 2006 WL 1314123 at *3, 2006 Bankr. LEXIS 845 at *9. Those courts conclude that the statute refers simply to payments "scheduled for a certain date." Id. This Court is persuaded that the conclusion reached by the Walker and Nockerts courts is the correct one. As the Nockerts court explained:

> . . . [A]lthough the Bankruptcy Code uses the phrase "scheduled as contractually due" only once (in § 707(b)(2)(A)(iii)), it also uses the phrase "scheduled as" only one time – in § 1111(a) . . . . While it is readily apparent from the [ ] terms and the context of the section that § 1111(a) is referring to the bankruptcy schedules, there is no similar reference or apparent context in § 707(b)(2)(A)(iii). Broadening the review to include the Bankruptcy Code's references to a claim or debt being "scheduled" turns up *two provisions that obviously mean "listed on the bankruptcy schedules"*: § 523(a)(3) (discharge of a debt that is "neither listed nor scheduled under section 521(1)"); and § 554(c) (deemed abandonment of property "scheduled under section 521(1)"), and *two provisions which obviously do not*: § 524(k)(3)(H)(ii) (suggested reaffirmation agreement language "describing the repayment schedule with the number, amount, and due dates or period of payments scheduled to repay the debts reaffirmed to the extent then known by the disclosing party); and § 1326(a)(1)(B) (debtor shall make pre-confirmation payments "scheduled in a lease of personal property directly to the lessor"). This exercise in statutory analysis compels the conclusion that "scheduled as contractually due" does not refer to the bankruptcy schedules. *When describing the bankruptcy schedules, Congress included in the statute a reference to the schedules, either directly by name or indirectly by reference to § 521, the provision that requires the debtor to file bankruptcy schedules. On the other hand, when the statute refers to scheduled payments, such as in the reaffirmation or pre-confirmation lease provision, the bankruptcy schedules are not mentioned.*

In re Nockerts, 357 B.R. at 502 (emphasis added). The provision at hand, § 707(b)(2)(A)(iii)(I), is more similar to the latter two provisions (§ 524(k)(3)(H)(ii) and § 1326(a)(1)(B)) than the former in that it does not refer to the bankruptcy schedules either

directly or by reference to the debtor's bankruptcy schedules filed pursuant to § 521. In addition, as the court in In re Sorrell noted, § 707(b)(2)(A)(iii)(I) has two more commonalities with § 524(k)(3)(H)(ii) and § 1326(a)(1)(B): "1) all the provisions were added in the 2005 Act; [and] 2) all the provisions address circumstances where a debtor scheduled payments in a lease or contract . . . ." 359 B.R. 167, 185 (Bankr. S.D. Ohio 2007). And, as noted by the court in In re Randle, "[t]here is no bankruptcy schedule that requires the debtor to list 'all amounts contractually due to secured creditors in each month of the 60 months following the date of the petition.'" 358 B.R. 360, 365 (Bankr. N.D. Ill. 2006), aff'd Randle v. Neary (In re Randle), 2007 U.S. Dist. LEXIS 54985 (N.D. Ill. July 20, 2007). For these reasons, the Court agrees and concludes that the reference to "payments scheduled as contractually due" means those payments required to be made on a monthly basis according to the debtor's contract with the secured lender.[9]

Nevertheless, even if this Court were to conclude that the Trustee's interpretation of the statute is the appropriate one – i.e., that "scheduled as" refers to the debtor's bankruptcy schedules – this would "really be a distinction without a difference." In re Haar, 360 B.R. at 766; see also In re Randle, 358 B.R. at 365. The "scheduling" of a secured debt on the debtor's bankruptcy petition does not change the fact that the payments are "contractually due." In re Haar, 360 B.R. at 764, 765; In re Sorrell, 359 B.R. at 184; In re Randle, 358 B.R. at 365; In re Singletary, 354 B.R. at 468. Nor does declaring an intention

---

[9] Other cases where courts have adopted this interpretation include: In re Kogler, 368 B.R. 785, 790 (Bankr. D. Wisc. 2007); In re Longo, 364 B.R. 161, 164-65 (Bankr. D. Conn. 2007); U.S. Tr. v. Mundy (In re Mundy), 363 B.R. 407, 412-13 (Bankr. M.D. Pa. 2007).

to ultimately surrender property to the creditor abrogate a debtor's contractual obligations.[10]

In re Longo, 364 B.R. at 165-66; In re Haar, 360 B.R. at 764; In re Sorrell, 359 B.R. at 184; In re Singletary, 354 B.R. at 467 n.11, 468; In re Walker, 2006 WL 1314123 at *4, 2006 Bankr. LEXIS 845 at *13-14.

> The debtor's contractual liability for the debt is not eliminated upon the surrender of the collateral. At the earliest, it may be eliminated by the entry of the discharge. . . . In other words, nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due.

In re Walker, 2006 WL 1314123 at *4, 2006 Bankr. LEXIS 845, *12-13.

### B.    "Following the date of the petition"

The phrase "scheduled as contractually due" does not stand in isolation. It is further modified by the remaining language of the statute – "scheduled as contractually due to secured creditors . . . *in each of the 60 months following the date of the petition*." This latter phrase must also be consistent with any proper analysis of its precedent language.

The Trustee correctly notes that the term "following" denotes a look forward, specifically, a look sixty months into the debtor's future. But the Trustee goes too far when she claims that this foward-looking term requires the Court to take into account only those

---

[10] The Court pauses briefly to note that even a debtor's expressed intention to surrender property is not conclusive evidence that the debtor will not make future payments on the secured property in the future. Although the First Circuit has made clear that a Chapter 7 debtor must make an election to reaffirm, redeem or surrender secured property, Bank of Boston v. Burr (In re Burr), 160 F.3d 843, 847-48 (1st Cir. 1998); 11 U.S.C. § 521(a)(2)(A), the First Circuit has also held that a debtor "surrenders" by "agree[ing] to make the collateral *available* to the secured creditor – *viz.*, to cede his possessory rights in the collateral . . . [but] nothing in subsection 521(a)(2) remotely suggests that the secured creditor is *required* to accept possession . . . ." Pratt v. General Motors Acceptance Corp. (In re Pratt), 462 F.3d 14, 19 (1st Cir. 2006). In short, what a "surrender" of property specifically *means* in all instances is a question left partially unanswered in this Circuit. See, e.g. In re Pratt, 462 F.3d at 18 & n.4 (citing In re Cornejo, 342 B.R. 834 (Bankr. M.D. Fla. 2005); Bankboston, N.A. v. Claflin (In re Claflin), 249 B.R. 840 (B.A.P. 1st Cir. 2000)); see also In re Lair, 235 B.R. 1 (Bankr. M.D. La. 1999).

payments that will *actually* be made. In re Haar, 360 B.R. at 766. Apart from the obvious practical difficulties the Court would encounter in trying to determine which debtors will *actually* make all payments required under their contracts with secured creditors during each of the sixty months following the petition, it is equally clear that the plain language of the statute does not contemplate the Court assuming this kind of predictive role.

The Court does agree that § 707(b)(2)(A)(iii)(I) is "forward-looking" in the sense that it takes into account payments required under the contract that are to made in each of the sixty months following the petition date. But it is clear from the plain language of the provision that this determination is to be made at the *time the petition is filed*. In re Haar, 360 B.R. at 766 ("the 60-month constraint . . . simply operates to define the period over which the debtor's 'contractually due' payments are averaged."). In this sense, then, the statute takes a "snap-shot" of the debtor's situation as of the petition date.[11] See In re Kogler, 368 B.R. at 791; In re Longo, 364 B.R. at 165; In re Haar, 360 B.R. at 767; In re Randle, 358 B.R. at 366; In re Nockerts, 357 B.R. at 504.

Nothing in the phrase "following the date of the petition" suggests that the calculation must include only those payments actually made. Instead, the phrase modifies the preceding portion of the statute which refers to those payments that are "scheduled as contractually *due.*"

---

[11] On this point, the Court disagrees with the conclusion reached in In re Singletary, where the court held that post-petition events, including a post-petition surrender of the collateral, could be taken into account in determining whether secured payments were properly deducted under § 707(b)(2)(A)(iii)(I). The Singletary court concluded that it was compelled by controlling Fifth Circuit precedent, In re Cortez, 457 F.3d 448 (5th Cir. 2006), to consider post-petition events until the time of the filing of a motion to dismiss pursuant to § 707(b)(2). This Court is not bound by the Cortez decision and, more importantly, interprets the latter part of § 707(b)(2)(A)(iii)(I) to clearly contemplate a look at the debtor's contractual obligations as of the date of the filing of the petition, without regard for post-petition occurrences.

> . . . the word "scheduled" . . . implies the possibility that the payments may not be made as required under the contract, either because the debtor will surrender the collateral or because the payments might be modified and paid through a Chapter 13 plan. If the intent were to permit only those payments that would actually be made in the post-petition period, Congress could have specified that the payments to be deducted are only those payments to be made on secure debts that the debtor intends to reaffirm.

Walker, 2006 WL 1314123 at *4, 2006 Bankr. LEXIS 845 at *11; see also In re Hartwick, 359 B.R. 16, 19 (Bankr. D.N.H. 2007); In re Randle, 358 B.R. 360, 363 (Bankr. N.D. Ill. 2006); In re Singletary, 354 B.R. at 471.

In sum, § 707(b)(2)(A)(iii)(I) is not ambiguous. On the contrary, it is perfectly clear – debtors may deduct, for purposes of the means test and on Form 22A, payments to their secured creditors that are required under contract to be paid in each of the sixty months after the date the petition is filed. See In re Randle, 358 B.R. at 363. Whether the payments will actually be made, whether the debtor will redeem the collateral, whether the debtor will reaffirm the debt or whether the debtor will eventually surrender the property to the secured creditor – all are possible outcomes that are not contemplated by the statute, not capable of determination on the date of the filing of the petition and, therefore, ought not be considered in determining the amount that may be deducted under § 707(b)(2)(A)(iii)(I). See id.

### C.     Congressional Intent

The Trustee relies heavily on congressional intent to argue that the Debtors' mortgage payments should not be deducted from their CMI, arguing that allowing the deduction would conflict with Congress' purpose in passing BAPCA "to ensure that those who can afford to repay some portion of their unsecured debt [be] required to do so." 151 Cong. Rec. S2459, 2469-70 (March 10, 2005); see also In re Hardacre, 338 B.R. 718

14

(Bankr. N.D. Tex. 2006). But congressional intent is only relevant where the statute is ambiguous or where a plain reading of the statute would result in an absurd result or one demonstrably at odds with congressional intent. See, e.g. Lamie, 540 U.S. at 534 ("It is well established that 'when the statute's language is plain, the sole function of the courts – at least where the disposition of the text is not absurd – is to enforce it according to its terms.'") (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000); Ron Pair, 489 U.S. at 241; Caminetti v. United States, 242 U.S. 470, 485 (1917)); Ron Pair, 489 U.S. at 242 ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)). "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." Ron Pair, 489 U.S. at 241. Here, the statute, as previously discussed, is not ambiguous.

Moreover, the plain reading of the statute does not produce an absurd result. While Congress' over-arching intention in creating the "means-test" may have been to identify those debtors who were capable of paying a percentage of their unsecured debts and to deny their Chapter 7 discharge and/or push them into the Chapter 13 framework, the intent of Congress in creating the specific mechanics of the means test under § 707(b)(2) appears more to have been a plan to reduce judicial discretion on the question of whether a particular case is presumed "abusive." See In re Kogler, 368 B.R. 785 (Bankr. D. Wisc. 2007); In re Mundy, 363 B.R. at 413-14; In re Haar, 360 B.R. at 767; In re Hardwick, 359 B.R. at 21; In re Sorrell, 359 B.R. at 184; In re Randle, 358 B.R. at 363-364; In re Hartwick, 352 B.R. 867, 870 (Bankr. D. Minn. 2006).

15

For instance, other portions of the means test, as expressed in Form 22A, clearly do not take into consideration a factually accurate picture of the debtor's financial situation. See In re Mundy, 363 B.R. at 413; In re Randle, 358 B.R. at 364; In re Nockerts, 357 B.R. at 504; In re Hartwick, 352 B.R. at 870. The debtor's income, for example, is calculated based on the debtor's actual income received in the six months prior to the petition filing. See 11 U.S.C. §§ 101(10A); 707(b)(2)(A)(i). Even if the Chapter 7 debtor has concrete and conclusive evidence that his or her post-petition income will differ from that six-month period, neither the statute nor Form 22A provide a basis for consideration of future income. See Walker, 2006 WL 1314123 at *6, 2006 Bankr. LEXIS 845 at *20.

Additionally, many of the expense deductions allowed to debtors are not based on the debtor's *actual* expenses – instead, debtors are only permitted in most instances to deduct standard expenses set by the Internal Revenue Service National and Local standards. See 11 U.S.C. § 707(b)(2)(A)(ii); In re Randle, 358 B.R. at 364; Walker, 2006 WL 1314123 at *7, 2006 Bankr. LEXIS 845 at *20. It cannot be fairly said, therefore, that Congress was overly-concerned with capturing an accurate, precise financial picture to determine whether the case would be presumed abusive. See  In re Randle, 358 B.R. at 364; Walker, 2006 WL 1314123 at *6, 2006 Bankr. LEXIS 845 at *18-19.

The deduction of secured payments due at the time of the petition filing – even if the debtor intends to eventually surrender the property – is consistent with the mechanical, discretion-void nature of the means test.  See In re Kogler, 368 B.R. at 790-91; Walker, 2006 WL 1314123 at *6, 2006 Bankr. LEXIS 845 at *18-19.  To read into § 707(b)(2)(A)(iii)(I) a requirement that the court inquire into possible future outcomes in each debtor's case "is completely contrary to Congress' intent because it requires the kind of

16

case-by-case adjustment based on a debtor's individual circumstances for the presumption of abuse that Congress rejected."[12] In re Randle, 358 B.R. at 364.[13]

IV.   CONCLUSION

For all the foregoing reasons, this Court rules that payments on secured debts may be included on Form 22A pursuant to § 707(b)(2)(A)(iii)(I) notwithstanding a debtor's intention to surrender the collateral.  In the present case, the Debtors properly calculated their CMI and expenses as required by § 707(b)(2) and Form 22A.  Since the Debtors' expenses exceed their Current Monthly Income, no presumption of abuse pursuant to § 707(b)(2) has arisen.  The Trustee's request for dismissal under § 707(b)(2) will accordingly be DENIED.

An order in conformity with this memorandum will issue forthwith.

DATED: September 26, 2007                    By the Court,

                                             /s/ Henry Jack Boroff
                                             _____
                                             Henry J. Boroff
                                             United States Bankruptcy Judge

---

[12] See also In re Mundy, 363 B.R. at 414; In re Haar, 360 B.R. at 767 ("what the position of the UST seeks to do is throw a wrench into this mechanical process . . . ."); In re Hardwick, 359 B.R. at 21; In re Nockerts, 357 B.R. at 503 ("when applying an arbitrary test like the means test, which substitutes formulaic calculations for judicial discretion, resort to the "spirit" of the law is inappropriate and leads to misapplication of the statute."); In re Singletary, 354 B.R. at 465 (consideration of possible future events would "eliminate the distinction between the presumption of abuse test and the totality of the circumstances test"); In re Walker, 2006 WL 1314123 at *5, 2006 Bankr. LEXIS 845 at *17 ("When applying a test that essentially judges the debtor's financial situation as it exists at the time of filing, it would be inconsistent to consider post-petition events to determine whether the debtor is entitled to deduct secured debt payments.").

[13] Of course, the Trustee is free to bring an action under § 707(b)(3), if she so chooses. In re Hardwick, 359 B.R. at 21-22; In re Singletary, 354 B.R. at 465; In re Walker, 2006 WL 1314123 at *8, 2006 Bankr. LEXIS 845 at *25.  As previously stated, her request for an extension of the deadline to file such a motion remains pending before the Court.